2022 IL App (1st) 210587-U

SECOND DIVISION
December 27, 2022

No. 1-21-0587

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court of |
| | ) | Cook County. |
| Respondent-Appellee, | ) | |
| | ) | |
| v. | ) | No. 92 CR 7449 |
| | ) | |
| JOHNNY FLOURNOY, | ) | |
| | ) | Honorable James B. Linn, |
| Petitioner-Appellant. | ) | Judge Presiding. |

JUSTICE HOWSE delivered the judgment of the court.
Presiding Justice Fitzgerald Smith and Justice Ellis concurred in the judgment.

ORDER

¶ 1 *Held*: We affirm the judgment of the circuit court denying defendant leave to file a successive postconviction petition on grounds of actual innocence. The "new" evidence is not of such a character that it would be likely to change the result on retrial. Defendant's claim that the State used false evidence against him at trial is barred by the doctrine of *res judicata* and, in any event, defendant cannot show prejudice. Defendant's claim of ineffective assistance of counsel due to counsel's failure to investigate a witness does not entitle him to relief because he cannot show prejudice.

¶ 2 Defendant Johnny Flournoy was convicted of first-degree murder and armed robbery for

the 1991 killing of Samuel Harlib and robbery of a used car dealership. Defendant filed a motion

seeking leave to file a successive postconviction petition. In his motion, defendant argues that he has supplied newly discovered evidence which presents a colorable claim of actual innocence. Defendant also argues that he has made a substantial showing that the State used false information to secure his conviction and that his trial counsel was constitutionally ineffective. The circuit court denied defendant's motion for leave to file a successive postconviction petition. For the following reasons, we affirm.

¶ 3                             BACKGROUND

¶ 4     On November 14, 1991, Samuel Harlib[1] was shot and killed as he was working at a car dealership on the north side of Chicago. At defendant's trial, Harlib's coworker, Raphael Mendoza testified he was present when Harlib was shot and identified defendant as the shooter.

¶ 5     Mendoza testified that he and Harlib were working at Ron/Mar Auto Sales, a used car dealership located at 3845 N. Western Avenue in Chicago. Mendoza and Harlib were in the sales office when they noticed a man outside looking at cars on the lot. Mendoza went outside and talked with the man, who Mendoza later identified to be defendant Johnny Flournoy. Mendoza was only two or three feet away from defendant and was looking at his face as they talked about the car. Mendoza notified Harlib that defendant was interested in one of the cars and had money for a down payment, so the three men talked together near the vehicle.

¶ 6     Harlib and defendant went to the office together while Mendoza did some work to get the car ready. When Mendoza finished getting the car ready, he went to join the other men in the office. As Mendoza walked into the office, defendant was standing inside holding a gun and he ordered Mendoza to sit down. Defendant was alternating between pointing the gun at Mendoza

---

[1] Defendant refers to the victim as Samuel Harib. The State refers to the victim as Samuel Harlib. "Harlib" is used more prominently in the record and appears to be the correct name, so we have used that name in this order.

and Harlib. Mendoza testified that Harlib lunged at defendant going for the gun, and the gun went off, firing into the floor. Defendant then pointed the gun at Harlib and shot at him twice from close range. Harlib screamed. Defendant grabbed around $1,000 in cash that was sitting on the desk. Defendant then fired multiple shots in Mendoza's direction but did not hit him before fleeing the scene.

¶ 7     Mendoza called 911 and police and an ambulance arrived. Harlib was taken from the scene in the ambulance. Mendoza went with the police to the station to answer some questions and then went to the hospital where he learned that Harlib had died. In his trial testimony, Mendoza repeatedly identified defendant as the person who killed Harlib and expressed no doubts that defendant was the person he encountered at the car dealership the day defendant committed the murder.

¶ 8     Mendoza viewed a physical lineup that included Reginald Smith and another witness who testified at trial, Ramano Ricks. Mendoza did not identify any of the individuals in the lineup as the person who was at the car dealership and shot Harlib. Mendoza did, however, identify Reginald Smith as a person he recognized. Mendoza told detectives that Smith was an acquaintance of Harlib and that Smith had previously purchased a car from their dealership. Mendoza told detectives that Smith sometimes came to the car lot to make payments, but Mendoza confirmed to detectives that Smith was not the person who shot Harlib.

¶ 9     The witness who was included in the lineup, Ramano Ricks,[2] briefly spoke to detectives after the lineup. Detective Lawrence Akin testified that he told Ricks that detectives were conducting an investigation but did not tell him anything about the incident they were

---

[2] Defendant refers to Ricks as "Romano" Ricks. However, in his affidavit, Ricks states his name as "Ramano," and Ramano is the name used more prominently in the record so we have used that name in this order.

investigating. Detective Akin testified that he gave Ricks his business card and told Ricks to call if he heard anything unusual or out of the ordinary.

¶ 10    Ricks contacted Detective Akin two months later after he was arrested for the robbery of a Jewel food store. Ricks was in Cook County Jail and wanted to be placed in protective custody. Ricks told Detective Akin that after he was in the lineup with Reginald Smith, Smith told him they were in the lineup for a murder that "[Smith] and Johnny did." Ricks knew Smith was talking about defendant, Johnny Flournoy. Smith told Ricks that he and defendant went to the car dealership to commit a robbery and that defendant killed the man working there. Ricks wanted to be placed in protective custody because someone tried to stab him while he was in jail. Ricks believed that defendant may have been behind the attempted stabbing because defendant had urged Ricks to take the fall for the robbery of the Jewel food store, but Ricks refused.

¶ 11    Detective Akin conducted another physical lineup for Mendoza to view, this time including defendant. Detective Akin stated that as soon as he opened the curtain, Mendoza immediately began shouting "that's him, that's him *** The last guy on the right is him" as he identified defendant as the person who killed Harlib.

¶ 12    Ramano Ricks testified at trial. He testified that he met defendant in Detroit a month before the murder, in October 1991. Defendant lent him money. Ricks came to Chicago for defendant's wedding in November 1991. Defendant asked Ricks to pay back the money he had borrowed. When Ricks told defendant he did not have the money, defendant told him he could commit an armed robbery to get the money. Defendant showed Ricks that he was carrying a gun, and defendant told Ricks that he did not have a choice but to commit a robbery to get the money.

¶ 13    Ricks testified that defendant gave him tips on performing an armed robbery and told him not to fire the weapon. Defendant told Ricks about committing a recent armed robbery at a car

dealership and that he fired his weapon at a guy during the course of that robbery. Ricks and Reginald Smith went forward with committing an armed robbery of a Jewel grocery store that day and they were arrested. Ricks and Smith were in custody for that robbery when they were placed in the first lineup that Mendoza viewed in this case.

¶ 14     Defendant presented alibi testimony from his wife, his mother, his stepdaughters, and his boss. The alibi witnesses testified that they knew defendant's whereabouts on the day of the murder and that defendant could not have been the perpetrator. One of his stepdaughters testified she was with defendant at the time of the murder, but they did not go to a car dealership. The State presented impeachment evidence that called into question the veracity of the alibi evidence, including prior statements from the alibi witnesses made to police that they did not know defendant's whereabouts at the exact time of the murder. The jury found defendant guilty of first-degree murder and armed robbery but acquitted him of the attempted murder of Mendoza.

¶ 15     Defendant filed a *pro se* posttrial motion claiming that he received ineffective assistance of counsel for the failure of counsel to call two witnesses, Elizabeth Barrier and Reginald Smith. According to police reports, during the early stages of the investigation, a person contacted police and told them Elizabeth Barrier might have information about someone named Sam being murdered at a car dealership. The police reportedly spoke to Barrier and she informed them that her friend Reginald Smith called her and informed her that his good friend had been killed and he wanted to see her. Smith allegedly told Barrier that his best friend Sam was a car dealer on Western Avenue who was killed during a robbery there. Barrier told police that when Smith arrived at her apartment, he told her that someone had shot his friend and that he had left the car dealership just five minutes before the shooting. Defendant alleged in his motion that his counsel should have called Reginald Smith and Elizabeth Barrier as witnesses at trial.

¶ 16    In response to the motion, trial counsel explained that he had spoken to Barrier and determined that her testimony would have only been helpful for the purpose of impeaching Reginald Smith if he was called as a witness. Trial counsel considered calling Smith as a witness but decided not to do so because much of Smith's testimony would have been harmful to defendant. The trial court denied the posttrial motion.

¶ 17    A death penalty hearing was held, and the jury rejected a death sentence for defendant. Defendant was sentenced to life in prison. Defendant's conviction was affirmed on direct appeal. *People v. Flournoy*, No. 1-94-4427 (Nov. 15, 1996) (unpublished order under Ill. S. Ct. R. 23). The Illinois Supreme Court denied defendant's petition for leave to appeal. *People v. Flournoy*, 172 Ill. 2d 557 (Table) (1997). Defendant filed a postconviction petition in which he argued: (1) the State used perjured testimony against him at trial; (2) the State suppressed evidence favorable to the defense; and (3) that he received ineffective assistance from his appellate counsel, who failed to raise these issues on direct appeal. Defendant also argued that his trial counsel was ineffective for several reasons, including that trial counsel: (1) failed to obtain a parole revocation hearing tape which could have been used to impeach Ramano Ricks and Detective Akin; and (2) failed to call Elizabeth Barrier as a witness. Defendant's postconviction petition was dismissed by the circuit court at the first stage. The dismissal of defendant's postconviction petition was affirmed on appeal. *People v. Flournoy*, No. 1-97-1987 (June 30, 1999) (unpublished order under Ill. S. Ct. R. 23). In addressing defendant's claim based on counsel's failure to call Barrier as a witness, we explained that defendant's claim failed because he "did not attach the affidavits of these witnesses to the post-conviction petition" and that "without these affidavits this court cannot determine whether Elizabeth Barrier *** could have provided any information or testimony favorable to [defendant]." *People v. Flournoy*, No. 1-97-1987, at p.

10. The Illinois Supreme Court denied defendant's petition for leave to appeal. *People v. Flournoy*, 187 Ill. 2d 577 (Table) (2000).

¶ 18    On February 21, 2021—27 years after he was convicted, defendant filed the motion seeking leave to file the successive postconviction petition that is the subject of this appeal. In his proposed successive postconviction petition, defendant claims he has newly discovered evidence that: (1) demonstrates his actual innocence; (2) shows the State concealed and fabricated evidence; and (3) shows that he received ineffective assistance of counsel at trial. In support of his successive postconviction petition, defendant attached affidavits from Ramano Ricks and Elizabeth Barrier.

¶ 19    In his affidavit, Ricks claims that after he appeared in the lineup for the investigation in this case, Detective Akin informed him about the murder at a car lot on the north side of Chicago that occurred during an armed robbery and indicated that Reginald Smith was involved. Ricks claims that while he was in jail for the armed robbery of the Jewel, he believed that either defendant or Smith was trying to have him killed, so he contacted Detective Akin to discuss Harlib's murder. Ricks admits that he told Detective Akin that Smith set up the robbery and defendant carried it out. Ricks further admits that he told Detective Akin that Smith had informed him that defendant confessed to Smith that he committed the murder right after the robbery occurred. Ricks admits that he gave a written statement summarizing what he told detectives.

¶ 20    Ricks, however, now claims that the statements he gave detectives "are false." Ricks claims in his affidavit that Smith "never made any statements to me to indicate that [defendant] was involved in the robbery and murder." Ricks claims that he gave the statement to detectives because he was angry at defendant because he believed defendant was behind the attacks against

him in jail. Ricks claims that he also fabricated the story about defendant himself telling Ricks that defendant and Smith had committed a robbery and that defendant shot someone during the robbery. Ricks now claims that defendant "never made any statements to me about having been involved in the robbery of a car dealer, or that he had shot someone." Ricks claims in his affidavit that both his grand jury and trial testimony were false. He states that he gave the false testimony because of his anger towards defendant and for help from the State with his own robbery case.

¶ 21    Defendant also attached an affidavit from Elizabeth Barrier[3] in support of his proposed successive postconviction petition. In her affidavit, Barrier claims that she met Reginald Smith at an inpatient rehab program in Chicago. She was addicted to crack cocaine. Barrier claims that Smith showed up to her apartment one night with cocaine and heroin. Smith told her that he had robbed a used car dealer and had shot the car dealer in front of his safe. Barrier told another individual named John what Smith had told her, and she believes John informed the police. Barrier claims, to the best of her recollection, that she refused to answer the police's questions about the shooting. She had slipped back into addiction and was scared of Smith. Barrier claims that regardless of what is recorded in the police reports from her interviews with police, Smith "specifically told [her] that he shot the car dealer he had robbed." Barrier also claims that trial counsel's statements that he had spoken to her on the phone were false and that she was never contacted by anyone in connection with this case about being a witness at trial.

¶ 22    Defendant contends in his successive postconviction petition that the affidavits from Ricks and Barrier constitute newly discovered, credible evidence of his innocence. Defendant

---

[3] Barrier refers to herself as Elizabeth Foster in her affidavit. She states that Barrier was her maiden name. For purposes of consistency and to avoid confusion, we have referred to her as Elizabeth Barrier throughout this order.

also contends in his proposed petition that the State violated his due process rights by not correcting the trial record when Ricks testified that he was not receiving any consideration for his testimony. Lastly, defendant contends that he received constitutionally ineffective assistance from his trial counsel for not locating and calling Barrier as a witness.

¶ 23    In a 26-page written order, the circuit court denied defendant leave to file his successive postconviction petition. Among other findings, the circuit court found that the affidavits did not constitute "newly discovered" evidence as is required for defendant's successive postconviction proceedings. The court also noted that, even if the evidence was considered to be newly discovered, it did not raise the probability that the result would be different on retrial. Ultimately, the circuit court found that defendant's proposed successive petition, along with the supporting evidence he supplied, did not meet the standard for going forward on a successive postconviction petition. Defendant filed this appeal.

¶ 24                                    ANALYSIS

¶ 25    On appeal, defendant raises three arguments from the circuit court's order denying him leave to file his successive postconviction petition. First, he argues the affidavits from Ricks and Barrier constitute newly discovered evidence that support a colorable claim of actual innocence. Second, defendant argues he made a substantial showing that the State violated his due process rights by failing to correct inaccurate testimony by Ricks during the trial. And third, he argues he made a substantial showing that he received ineffective assistance of counsel at trial based on counsel's failure to investigate or call Barrier as a trial witness.

¶ 26    The Post-Conviction Hearing Act provides a method by which defendants may assert that, in the proceedings that resulted in their convictions, there was a substantial denial of their rights under the federal or state constitutions. *People v. Hodges*, 234 Ill. 2d 1, 9 (2009); 725

ILCS 5/122–1 *et seq.* (West 2020). A postconviction proceeding allows inquiry only into constitutional issues that were not and could not have been adjudicated on direct appeal. *People v. Williams*, 394 Ill. App. 3d 236, 242 (2009). Therefore, where a petitioner has previously taken an appeal from a judgment of conviction, the ensuing judgment of the reviewing court will bar, under the doctrine of *res judicata,* postconviction review of all issues decided by the reviewing court and any other claims that could have been presented to the reviewing court will be deemed waived. *People v. Edwards*, 2012 IL 111711, ¶ 21. Moreover, when a defendant is seeking to file a successive postconviction petition, the issues he could have but did not raise in his initial petition are waived. See 725 ILCS 5/122–3 (West 2018) ("Any claim of substantial denial of constitutional rights not raised in the original or an amended [postconviction] petition is waived.").

¶ 27   Under the Post-Conviction Hearing Act, petitioners are entitled to file only one postconviction petition, and any subsequent petitions are allowed only with leave of court. 725 ILCS 5/122-1(f) (West 2020). The limitation on filing multiple postconviction petitions is intended to limit the filing of both successive and frivolous postconviction petitions (*People v. Smith*, 2014 IL 115946, ¶ 24) and successive postconviction petitions are disfavored by Illinois courts (*People v. Johnson*, 2019 IL App (1st) 153204, ¶ 31). A petitioner must meet a higher burden to go forward on a successive postconviction petition than he must meet at the first stage of original postconviction proceedings. *Edwards*, 2012 IL 111711, ¶¶ 25-29.

> "A request for leave to file a successive petition should be denied only where it is clear from a review of the petition and supporting documentation that, as a matter of law, the petition cannot set forth a colorable claim of actual innocence. [Citation.] Accordingly, leave of court should be granted where the petitioner's supporting

documentation raises the probability that it is more likely than not that no reasonable juror would have convicted the petitioner in light of the new evidence. [Citation.] At the pleading stage of postconviction proceedings, all well-pleaded allegations in the petition and supporting affidavits that are not positively rebutted by the trial record are to be taken as true. [Citations.] In deciding the legal sufficiency of a postconviction petition, the court is precluded from making factual and credibility determinations. [Citations.]" *People v. Robinson*, 2020 IL 123849, ¶¶ 44-45.

¶ 28 We review the denial of leave to file a successive postconviction petition *de novo. Id*. at ¶ 25.

¶ 29 Before turning to the merits of the appeal, we must address the contention that defendant cannot raise his claim of actual innocence because it is based on the same evidence defendant uses to support his claims of violations of his constitutional rights. In *People v. Hobley*, our supreme court held that a postconviction petitioner cannot raise a "free-standing" claim of actual innocence based on newly discovered evidence that is being used to supplement an assertion of a constitutional violation with respect to the trial. *People v. Hobley*, 182 Ill. 2d 404, 443-44 (1998).

"A 'free-standing' claim of innocence means that the newly discovered evidence being relied upon "is not being used to supplement an assertion of a constitutional violation with respect to [the] trial.' See *Washington,* 171 Ill. 2d at 479. For example, in *Washington,* a witness came forward years after the defendant's conviction and stated that two other men had committed the murder for which the defendant was convicted, and that she had not come forward sooner out of fear for her life. [Citation.] This newly discovered evidence was deemed sufficient to grant relief." *Hobley*, 182 Ill. 2d at 443-44.

¶ 30 In this case, the issue arises because defendant is claiming Ricks' affidavit recanting his prior testimony that defendant admitted shooting the victim directly to Ricks is newly discovered evidence of his actual innocence and using Ricks' affidavit to supplement his claim the State knowingly used perjured testimony when it allowed Ricks to testify that defendant admitted shooting the victim. In *Hobley*, our supreme court initially found that the newly discovered evidence in that case could establish a violation at trial of the defendant's constitutional right to due process. *Id*. at 444. Regarding the defendant's subsequent claim of actual innocence based on the same evidence, our supreme court held the evidence did not support a "free-standing" claim of actual innocence and the defendant has "therefore not properly raised a claim of actual innocence."

¶ 31 Defendant in this case argues our supreme court rejected this holding in *People v. Coleman* and found that a defendant who can make both a freestanding claim of actual innocence and a claim of a deprivation of a constitutional right at trial based on the same evidence "is not required to choose which claim to pursue." In *Coleman*, our supreme court rejected the federal courts' distinction between "free-standing" claims of actual innocence and "gateway" claims of actual innocence. See *People v. Coleman*, 2013 IL 113307, ¶¶ 90-91. The court stated it "may have used the label 'freestanding' to describe the claim in *Washington,* but not as an alternative to the label 'gateway.' " *Id*. ¶ 90. In rejecting the federal dichotomy, our supreme court did not overrule or abrogate *Hobley*. See *People v. Griffin*, 2022 IL App (1st) 191101-B, ¶ 33 ("We acknowledge the court's comment in *Coleman* but reject any suggestion that by that comment the court overruled either *Hobley* or *Orange*. We read the court's comment as merely identifying the applicable standard for the different types of claims. In point of fact, the court made no

reference to *Hobley* or its apparent rule that the different claims may not rely on the same supporting documentation in order for the actual innocence claim to be freestanding.").

¶ 32     We also independently find that *Coleman* stands for no more than the proposition that the burden on a defendant raising a postconviction claim of actual innocence is the same whether that claim of actual innocence could be classified under federal law as a "gateway" claim as opposed to a "free-standing" claim. *Coleman*, 2013 IL 113307, ¶ 91 ("the evidentiary burden for an actual-innocence claim is always the same whether or not it would be considered a freestanding or gateway claim under federal law."). Furthermore, as this court has recently reaffirmed, "[t]he *Hobley* court created a rule that disallowed petitioners from using newly discovered evidence demonstrating actual innocence to also support alternative claims of constitutional trial error within the same postconviction petition." *Griffin*, 2022 IL App (1st) 191101-B, ¶ 34.

¶ 33     We will return to this matter at the appropriate moment in our disposition. Suffice now to say that given the vociferation of defendant's actual innocence argument compared with the argument the State knowingly used perjured testimony, specifically when it allowed Ricks, unchallenged, to testify defendant admitted shooting the victim to Ricks, we will consider defendant's evidence of Ricks' recantation of that testimony as it pertains to his claim he is actually innocent.

¶ 34                              I. Actual Innocence

¶ 35     Our supreme court has explained the substantive component of the courts' approach to postconviction claims of actual innocence and, recently, how that component is to be executed in practice.

"Substantively, in order to succeed on a claim of actual innocence, the defendant must present new, material, noncumulative evidence that is so conclusive it would probably change the result on retrial. [Citation.] New means the evidence was discovered after trial and could not have been discovered earlier through the exercise of due diligence. [Citation.] Material means the evidence is relevant and probative of the petitioner's innocence. [Citation.] Noncumulative means the evidence adds to what the jury heard. [Citation.] And conclusive means the evidence, when considered along with the trial evidence, would probably lead to a different result. [Citation.]" *Coleman*, 2013 IL 113307, ¶ 96.

¶ 36    We focus here on the requirement that the evidence must be "so conclusive it would probably change the result on retrial." *Id.* Our supreme court has stated that "the conclusive character element refers to evidence that, when considered along with the trial evidence, would probably lead to a different result." *People v. Robinson*, 2020 IL 123849, ¶ 47. This is "the most important element of an actual innocence claim." *Id.* Our supreme court has cautioned that:

"Ultimately, the question is whether the evidence supporting the postconviction petition places the trial evidence in a different light and undermines the court's confidence in the judgment of guilt. [Citation.] The new evidence need not be entirely dispositive to be likely to alter the result on retrial. [Citations.] Probability, rather than certainty, is the key in considering whether the fact finder would reach a different result after considering the prior evidence along with the new evidence. [Citation.]" *Robinson*, 2020 IL 123849, ¶ 48.

¶ 37    At this stage of proceedings the question is whether defendant has set forth a colorable claim of actual innocence. *Id.* ¶ 50. To answer it, "we consider his motion for leave to file the

successive petition, along with the supporting affidavits, to ascertain whether he has raised the probability that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence"—or in other words, whether defendant has placed the trial evidence in a different light sufficient to undermine our confidence in the judgment of guilt. See *id*. ¶¶ 48-50. We note that our supreme court has directed that:

> "the inquiry applicable at the leave-to-file stage of successive proceedings does not focus on whether the new evidence is inconsistent with the evidence presented at trial. Rather, the well-pleaded allegations in the petition and supporting documents will be accepted as true unless it is affirmatively demonstrated by the record that a trier of fact could never accept their veracity. In assessing whether a petitioner has satisfied the low threshold applicable to a colorable claim of actual innocence, the court considers only whether the new evidence, if believed and not positively rebutted by the record, *could lead to acquittal on retrial*." (Emphasis added.) *Id*. ¶ 60.

Finally, we must also consider evidence in support of the petition that would be hearsay at a subsequent trial. See *id*. ¶ 80 (citing Ill. R. Evid. 1101(b)(3) (eff. Sep. 17, 2019)).

¶ 38     The trial court found that the evidence derived from the affidavits was not newly discovered. Defendant argues that the affidavits from Ricks and Barrier, viewed alongside the trial evidence, present a colorable claim of actual innocence. He maintains that Ricks' recantation and Barrier's statement that Reginald Smith confessed to the shooting in her presence should have caused the trial court to grant him leave to file his successive postconviction petition. The State argues that the evidence is not "new" because our supreme court has defined "new evidence" for purposes of a successive

postconviction petition as evidence which is discovered "after trial and could not have been discovered earlier through the exercise of due diligence" (see *Coleman*, 2013 IL 113307, ¶ 96) and defendant has failed to demonstrate due diligence. The burden of showing due diligence falls on the defendant. *People v. Walker*, 2015 IL App (1st) 130530, ¶ 18. Or, put another way, the defendant bears the burden of showing that there has been no lack of diligence on his part. *People v. Wingate*, 2015 IL App (5th) 130189, ¶ 26.

¶ 39      The parties dispute the issue of whether the evidence is newly discovered. However, even if we assume defendant's evidence in support of actual innocence is newly discovered, petitioner cannot prevail in this case because the evidence is not so conclusive it would probably lead to a different result at trial. *Edwards*, 2012 IL 111711, ¶ 32 (a defendant cannot prevail on his successive postconviction claim unless he can satisfy the requirement that the evidence be "conclusive"—that the evidence, when considered along with the trial evidence, would probably lead to a different result on retrial). Taking the information in Ricks and Barriers' affidavits as true, and in spite of the hearsay nature of the evidence in Barrier's affidavit, there is no probability that the evidence would change the result on retrial. Here we must consider the pertinent averments in Ricks and Barrier's affidavits. We address each affidavit in turn.

¶ 40      Turning first to Ricks, he averred, in pertinent part, as follows:

            "Detective Aikin told me that the murder occurred during an armed

      robbery, the victim had been shot, and Reggie [Smith] was involved in the

      murder. Detective Aikin described for me how the shooting occurred.

After Detective Aikin gave me that information, I *truthfully* told him that I did not know anything about the shooting.

* * *

After [an] attempt to stab me, I called *** Detective Aikin ***. *** I told him that I was willing to help him with the murder involving the car dealer.

* * *

*** Detective Aikin told me how the shooting occurred.

* * *

I told Detective Aikin that Reggie [Smith] told me that he had set up the robbery of a car dealer he knew, and that he drove [defendant] to the car lot to do the robbery. I further told Detective Aikin that Reggie [Smith] told me that when [defendant] came out, he told Reggie [Smith] that he had shot the guy.

* * *

My statements that Reggie [Smith] told me that he drove [defendant] to the car lot to do the armed robbery and that [defendant] told Reggie [Smith] he had shot the guy during the robbery are false.

Reggie [Smith] never made any statements to me to indicate that [defendant] was involved in the robbery and murder.

* * *

I specifically asked Detective Aikin if he could help me on my pending armed robbery case. Detective Aikin told me that he could not 'officially' help me, but that he would see what he could do to get me a lesser sentence. He told me that he would help me get into a work release program.

\* \* \*

Detective Aikin told me that they could not bring a case against [defendant] unless I testified that [defendant] told me about being involved in the murder.

I then made up a story about [defendant] telling me that he and Reggie [Smith] had robbed a car dealer, and during the robbery [defendant] shot the owner.

The story I made up was false. [Defendant] never made any statements to me about having been involved in the robbery of a car dealer, or that he had shot someone.

Again, I made up the story because I was mad at [defendant,] and because I wanted help on my pending armed robbery case.

\* \* \*

My testimony before the grand jury was false, in that *neither Reggie [Smith] nor [defendant] ever made statements to me suggesting that [defendant] was involved in the robbery and murder of the car dealer.*

\* \* \*

\*\*\* I served approximately 2.5 years of my 10-year sentence before I was allowed work release." (Emphases added.)

¶ 41 The new statement from Ricks is not probative of defendant's innocence nor could it lead to an acquittal on retrial. Contrary to defendant's assertion in his reply brief that "[b]oth affidavits support a conclusion that Reginald Smith, not [defendant], was the shooter," Ricks' affidavit does not speak to the identity of the shooter whatsoever. Ricks merely says he

fabricated his prior statements and testimony that defendant confessed to the shooting and that Smith told Ricks that defendant was the shooter. That is not the same as saying Smith was the shooter or even that defendant was not the shooter. All Ricks averred is at best that defendant did not confess to Ricks that defendant shot the victim and Smith did not tell Ricks defendant shot the victim. We find, based on Ricks' affidavit, as a matter of law Ricks cannot testify at trial to anything that tends to prove defendant's innocence or that would lead to an acquittal upon retrial, considering all the evidence. Accepting Ricks' affidavit as true can only remove one piece of damaging evidence against defendant but Ricks' evidence is not the only, or even the strongest, evidence against defendant.

¶ 42    Ricks' substantive utility for defendant's claim of actual innocence is effectively naught. Thus, even if Ricks' recantation is accepted as true, his evidence is not of such conclusive character that no reasonable juror could fail to acquit defendant after considering the prior evidence along with the new evidence. See *Robinson*, 2020 IL 123849, ¶¶ 48-50.

¶ 43    Turning next to Barrier's affidavit, she avers, in pertinent part, that:

>   "In late 1991, Reggie [Smith] showed up at my apartment one night with cocaine and heroin.
>
>   At that time Reggie [Smith] told me that he had robbed a used car dealer, and that he had shot the car dealer in front of his safe.
>
> \* \* \*
>
>   To the best of my memory, when police asked me about the shooting I refused to answer their questions.
>
> \* \* \*

*** Reggie [Smith] specifically told me that he shot the car dealer he had robbed.

\* \* \*

I never spoke with anybody representing [defendant] about what Reggie [Smith] told me.

In fact, until recently I had never heard of [defendant] or that he was prosecuted for the murder of the car dealer Reggie [Smith] confessed to me he had shot and killed.

\* \* \*

*** I was never contacted about being a witness at [defendant's] trial."

¶ 44 Barrier's affidavit does point to someone else as the shooter in the murder. It is therefore conceivable that if a jury was able to somehow consider the statements in Barrier's affidavit at a trial, it could lead to an acquittal on *some* counts of the indictment against defendant. However, the State indicted defendant on three counts of first degree murder: that he, without lawful justification, (1) intentionally and knowingly shot and killed Samuel Harlib with a gun (count I), (2) shot and killed Samuel Harlib with a gun knowing that such shooting with a gun created a strong probability of death (count II), and (3) while committing a forcible felony, to wit: armed robbery, shot and killed Samuel Harlib with a gun in violation of section 9-1-A(3) of the Illinois statutes (count III). Section 9-1-A(3) read, at the time of defendant's conviction, as follows: "A person who kills an individual without lawful justification commits first degree murder if, in performing the acts which cause the death: *** he is attempting or committing a forcible felony other than second degree murder." 720 ILCS 5/9-1(a)(3) (West 1992). In brief, the State charged defendant with felony murder. The jury returned a "general verdict" of guilty of first degree

murder. See *People v. Woods*, 2021 IL App (1st) 190493, ¶ 70, *People v. Bobo*, 375 Ill. App. 3d 966, 978 (2007) (a general verdict is one in which the jury does not determine the defendant is guilty under a specific theory of the offense). "It is 'well settled' that, when an indictment alleges multiple forms of a single murder, and a general verdict is returned finding defendant guilty of first-degree murder, 'the net effect is that the defendant is guilty as charged in each count.' [Citations.]" *People v. Valdez*, 2022 IL App (1st) 181463, ¶ 173.

¶ 45    Barrier's affidavit says nothing about defendant's participation in the robbery. Barrier has expressed no knowledge of the armed robbery in this case. Accepting as true, for purposes of defendant's motion for leave to file a successive petition, that Smith "shot and killed Samuel Harlib with a gun" (counts I and II), when considered along with the trial evidence, that fact does not raise the probability that it is more likely than not that no reasonable juror would convict defendant of *felony murder* (count III). The jury's verdict constitutes a finding of guilty of felony murder. *Valdez*, 2022 IL App (1st) 181463, ¶ 173. Therefore, we find as a matter of law that the averments by Barrier fail to meet the requirement of being likely to bring about a different outcome on retrial.

¶ 46    Defendant has failed to demonstrate that based on Ricks and Barrier's affidavits there would likely be a different result on retrial. The circuit court did not err when it denied defendant leave to file his successive postconviction petition.

¶ 47                                    II. Claimed Due Process Violation

¶ 48    Defendant argues that he made a substantial showing with newly discovered evidence that the State violated his due process rights when it concealed evidence that Ricks did receive consideration for his cooperation in the case against defendant. Defendant also argues that the State knowingly relied on perjured testimony from Ricks and Detective Akin in its case in chief

that Ricks did not ask for consideration in exchange for his cooperation and Ricks' testimony defendant admitted he was the shooter.

¶ 49    Unlike claims of actual innocence, leave of court to file a successive postconviction petition for a violation of a constitutional right may only be granted when a petitioner: (1) demonstrates cause for failing to bring the claim in initial postconviction proceedings; and (2) prejudice results from that failure. 725 ILCS 5/122-1(f) (West 2020). This standard is known as the "cause-and-prejudice test." *Smith*, 2014 IL 115946, ¶ 24 (citing *People v. Tidwell*, 236 Ill. 2d 150, 156 (2010)). To establish cause, a defendant must identify an objective factor that impeded their ability to raise a specific claim during his initial postconviction proceedings. *People v. Wilson,* 2014 IL App (1st) 113570, ¶ 33. To establish prejudice, a defendant must demonstrate that the claim that was not originally raised infected the trial to the extent that the resulting conviction or sentence violated due process. *Id*. From our review of the record we conclude defendant has failed to demonstrate the requisite cause and prejudice to present this claim.

¶ 50    "Prejudice" for purposes of a motion for leave to file a successive postconviction petition is defined similarly to the "prejudice" required to support a claim of ineffective assistance of counsel. *People v. Pitsonbarger*, 205 Ill. 2d 444, 464 (2002). In *Pitsonbarger*, our supreme court adopted the *Strickland* standard of prejudice for successive postconviction petitions, which was first articulated in *People v. Flores*, 153 Ill. 2d 264, 280 (1992) ("Whether the seemingly narrower test of prejudice required in a *Strickland* analysis satisfies the requisite showing of prejudice under *McCleskey* is uncertain."), and reaffirmed that adoption in *Smith*, 2014 IL 115946, ¶ 34 ("We analogized the cause-and-prejudice test in the context of a successive postconviction petition to the cause-and-prejudice test for ineffective assistance of counsel articulated in *Strickland v. Washington*." (citing *Pitsonbarger*, 205 Ill. 2d at 464.)). Applying that

standard in this context, "the question is not whether a court can be certain [the error] had no effect on the outcome or whether it is possible a reasonable doubt might have been established [absent the error.]" *People v. Lewis*, 2022 IL 126705, ¶ 46 (quoting *People v. Johnson*, 2021 IL 126291, ¶ 54).

> "Instead, [the court] asks whether it is 'reasonably likely' the result would have been different. *Strickland*, 466 U.S. at 696. A defendant must show that there is a reasonable probability that, but for [the error] the result of the proceeding would have been different. [Citation.] A reasonable probability is a probability sufficient to undermine confidence in the outcome. [Citation.]" *Lewis*, 2022 IL 126705, ¶ 46.

¶ 51   Additionally, this court has found that a constitutional error so infected the trial that the conviction violates due process where the alleged error was a material element of the defendant's conviction. See *People v. Montanez*, 2022 IL App (1st) 191930, ¶¶ 45-46 (noting "ample evidence" of the defendant's guilt and finding that allegedly wrongfully withheld impeachment evidence "was not material to [the] defendant's guilt or innocence"). At the "leave to file" stage of successive postconviction proceedings the defendant is only required to demonstrate a *prima facie* showing of cause and prejudice. *People v. Searles*, 2022 IL App (1st) 210043, ¶ 61 (citing *People v. Bailey*, 2017 IL 121450, ¶ 24). To proceed with the claim the defendant must demonstrate both "cause" and "prejudice" as to each claim. *Pitsonbarger*, 205 Ill. 2d at 463-64; *Montanez*, 2022 IL App (1st) 191930, ¶ 43 ("We can decide this issue without resolution of whether defendant established cause sufficient to file the successive postconviction petition because he cannot establish prejudice.").

"[L]eave of court to file a successive postconviction petition should be denied when it is clear, from a review of the successive petition and the documentation submitted by the petitioner, that the claims alleged by the petitioner fail as a matter of law or where the successive petition with supporting documentation is insufficient to justify further proceedings. [Citation.] The denial of a defendant's motion for leave to file a successive postconviction petition is reviewed *de novo*." *Montanez*, 2022 IL App (1st) 191930, ¶ 29 (citing *Bailey*, 2017 IL 121450, ¶ 13).

¶ 52    Assuming, as we must at this stage of proceedings, the truth of defendant's allegations, defendant has failed to demonstrate prejudice from any due process violation stemming from the State's alleged failure to disclose that Ricks received consideration for his cooperation in the case against defendant and defendant has failed to identify cause for his failure to bring forth his claim at an earlier time. As foreshadowed, we find defendant is procedurally barred from arguing that Ricks' recantation supports an independent claim of a violation of his constitutional rights based on the State knowingly using perjured testimony. *Griffin*, 2022 IL App (1st) 191101-B, ¶ 34.

¶ 53    We also note  that defendant's claim the State knowingly used perjured testimony when Ricks testified defendant admitted shooting the victim fails to demonstrate prejudice to defendant. If a defendant's claimed violation of a constitutional right itself lacks merit the defendant cannot show prejudice. *People v. Page*, 2022 IL App (4th) 210374, ¶ 29. On the merits of defendant's claim, "the State only has an obligation to correct the testimony of a witness when it has knowledge that the witness is mistaken in his testimony." (Internal quotation marks omitted.) *People v. Wright*, 2013 IL App (1st) 103232, ¶ 47. Although not stated explicitly

defendant suggests the State knew Ricks' testimony defendant admitted shooting the victim to Ricks was false because Ricks initially stated Smith told him Ricks admitted the shooting but Ricks changed his story after Detective Aiken told Ricks that the State could only prosecute defendant if defendant admitted the shooting directly to Ricks. However, defendant asserts Ricks provided this particular piece of newly discovered evidence—the timing of Ricks changing his story—in his affidavit. Other than the change in the source of the information itself, defendant does not rely on anything in the record to show the State knew Ricks' testimony was false. "Accordingly, the State did not have an obligation to correct the allegedly false testimony of the witness when it did not know that the witness's testimony was untrue." *Wright*, 2013 IL App (1st) 103232, ¶ 50. Even if we accepted the alleged change in Ricks' statements as some evidence his testimony might be untrue we find it unconvincing to establish the State had knowledge that the witness was necessarily mistaken in his testimony or that our confidence in the result of the trial is undermined, and therefore, we find no due process violation.

¶ 54    Turning to defendant's claim the State concealed evidence Ricks obtained work release in exchange for his testimony, we find as a matter of law that defendant failed to make a *prima facie* showing that this potentially impeaching information was not already known to him. The evidence available to defendant prior to trial informs defendant that Ricks sought something in exchange for his testimony against defendant but it does not establish that Ricks actually did receive anything. Initially, we note that Ricks' affidavit, even when taken as true, does not establish on its face that he actually received any consideration from the State in return for his testimony. Ricks' affidavit states as follows:

"I specifically asked Detective Aiken if he could help me on my pending armed robbery case. Detective Aikin told me that he could not 'officially' help

me, but that he would see what he could do to get me a lesser sentence. He also

told me that he would help me get into a work release program.

* * *

To the best of my recollection, I served approximately 2.5 years of my 10-

year sentence before I was allowed work release."

¶ 55    Ricks averred he asked for work release, and later he received work release. A reasonable

fact finder could assume Ricks received work release in exchange for his cooperation and we

acknowledge such a determination can only be made after an evidentiary hearing. See *People v.*

*Colasurdo*, 2020 IL App (3d) 190356, ¶ 45 (citing *People v. Pendleton*, 22 Ill. 2d 458, 473

(2006) (fact-finding and credibility determinations are involved in a third-stage evidentiary

hearing). Nonetheless, " 'it is incumbent upon [a petitioner], by whatever means, to prompt the

circuit court to consider whether "leave" should be granted, and obtain a ruling on that question.'

[Citation.] Defendant not only has the burden to obtain leave of court, but also 'must submit

enough in the way of documentation to allow a circuit court to make that determination.'

[Citation.] This is so under either exception, cause and prejudice or actual innocence." *Edwards*,

2012 IL 111711, ¶ 24.

¶ 56    In this case, Ricks has not minimally averred he received work release in exchange for

his testimony to "prompt the circuit court to consider whether 'leave' should be granted," and

defendant has failed to submit *any* evidence or documentation that would have allowed the court

to make a determination on that claim. Ricks does not aver that Aiken or anyone from the State

ever informed him that his work release resulted from his cooperation in defendant's case. There

are facts that militate against that conclusion. As the State notes on appeal, defendant's armed

robbery conviction was eligible for day-for-day good conduct credit (730 ILCS 5/3-6-3(a)(2)

(West 1994)) which results in defendant only having to serve 5 years in the Illinois Department of Corrections for his sentence and, consequently, that defendant did in fact serve half of his effective sentence in prison. The State argues this fact, and Ricks' own testimony on cross-examination that he did not have "too much longer to go" on his sentence (approximately two years at the time of trial), and we agree, affirmatively rebuts defendant's current claim Ricks did receive consideration in exchange for his testimony.

¶ 57     We have no need to decide whether the record affirmatively positively rebuts this claim. "The motion for leave to file is directed to the court, and it is the court that must decide the legal question of whether a defendant has satisfied the section 122-1(f) requirement of showing cause and prejudice." *Bailey*, 2017 IL 121450, ¶ 24. We hold, as a matter of law, defendant's petition and supporting documentation fail to demonstrate a *prima facie* showing of prejudice. Defendant has failed to establish prejudice from the State's failure to disclose the consideration for any "deal" with Ricks in exchange for his testimony. The utility of evidence of what Ricks asked for and what Ricks received in exchange for his testimony is to undermine Ricks' credibility by demonstrating Ricks' motivation to fabricate testimony. See *People v. Collins*, 366 Ill. App. 3d 885, 893 (2006) ("In this case, evidence that Harrington's battery arrest had been stricken with leave to reinstate was relevant to show his potential interest, bias, or motive to testify, as this fact could cause one to infer that Harrington had motive to testify favorably for the State." (citing *In re T.S.,* 287 Ill. App. 3d 949, 956 (1997) ("In *T.S.,* for example, this court held that the juvenile respondent in that case should have been allowed to cross-examine the victim about his arrests that had been stricken with leave to reinstate because they may have revealed the witness's motivation to lie and whether he contemplated any leniency in exchange for his testimony."))). *Collins*, 366 Ill. App. 3d at 893.

¶ 58     Defendant had ample evidence of Ricks' motive to testify falsely and that he may have actually testified falsely. Defendant possessed evidence Ricks asked for assistance with his own armed robbery charge. Defendant also possessed evidence that suggested that the only information Ricks could provide about the robbery and murder in this case came from statements by Smith that would have been inadmissible as hearsay. It was allegedly only after Detective Aiken explained to Ricks that the State could not use him unless he had evidence about what defendant said that Ricks provided statements by defendant effectively confessing to the murder. Defendant possessed evidence to attack the motive and substance of Ricks' testimony but the trier of fact chose to believe Ricks.

¶ 59     We find as a matter of law that absent the "concealment" of additional impeachment evidence that Ricks received a minor (by his own admission) concession in exchange for his testimony it is not possible a reasonable doubt might have been established. Defendant has not shown how the addition of this evidence casts Ricks' testimony in any worse light than it already was. It is not reasonably likely that had the trier of fact heard, in addition to evidence that Ricks was motivated to testify favorably for the State to gain assistance with his robbery charge, that Ricks received work release toward the end of his sentence, that the result of the trial would have been different. The fact defendant did not have this specific piece of information, viewed in the light of all of the trial evidence, does not undermine our confidence in the outcome. Accordingly, we find as a matter of law defendant has failed to demonstrate a *prima facie* showing of prejudice and, further, defendant cannot demonstrate prejudice on this particular claim.

¶ 60     Turning next to defendant's' claim the State knowingly relied on perjured testimony that Ricks did not seek consideration in exchange for his cooperation—noting again defendant may not rely on Ricks' recantation to support a claim of a violation of his constitutional right—we

find defendant failed to demonstrate cause for failing to bring this claim in the initial postconviction proceedings. Defendant's only claim of "cause" for failing to raise this claim sooner is that "the information contained in [the] affidavits was not available to [defendant] at the time of trial or when he filed his first petition." However, where the material needed to raise the claim is available at the time of the initial petition, and the absence of that material is the purported "cause" of the failure to raise the claim at that time, this court will find the cause element has not been demonstrated. See *People v. Blalock*, 2022 IL 126682, ¶¶ 44-45 (citing *People v. Brandon*, 2021 IL App (1st) 172411, ¶ 59 (citing *Pitsonbarger*, 205 Ill. 2d at 462)); compare *People v. Weathers*, 2015 IL App (1st) 133264, ¶ 36 ("Because this newly discovered evidence was not available at the time of defendant's prior petitions, he has established the requisite cause, in that an objective factor impeded his ability to raise this claim at an earlier time.").

¶ 61    The record directly rebuts defendant's claim the affidavits make clear that defendant "did not have any outside evidence to prove that Ricks has been lying until [Ricks] himself came forward." This court will only accept as true allegations that are *not* positively rebutted by the record. *People v. Griffin*, 2022 IL App (1st) 191101-B, ¶ 24. In this case the record demonstrates that defendant had knowledge in 1992 that Ricks was seeking consideration from the State in connection with his cooperation in this case. The transcript from defendant's revocation hearing demonstrates that defendant knew about Ricks' efforts to seek consideration. Defendant was present at the hearing and was represented by counsel. He attached a copy of the transcript to his original postconviction petition. Defendant knew about the claim when he filed his initial postconviction petition because he raised almost the identical claim and supported it with *some* evidence. "A defendant is not permitted to develop the evidentiary basis for a claim in a

piecemeal fashion in successive postconviction petitions, as defendant has attempted to do here." *Davis*, 2014 IL 115595, ¶ 55; see also *People v. Green*, 2012 IL App (4th) 101034, ¶ 40. Defendant does not argue nor do we find that the affidavit provides anything additional in support of this particular claim that would be sufficient to establish "cause."

¶ 62     We find as a matter of law defendant cannot establish "cause" for this claim. The record demonstrates that this claim was known to defendant and available to be supported by evidence at the time of trial and at the time he filed his initial petition. Defendant has failed to make a *prima facie* showing of cause for failing to raise this claim in his initial petition. Accordingly, the trial court did not err in denying leave to file the successive petition.

¶ 63                    III. Ineffective Assistance of Trial Counsel

¶ 64     Finally, defendant argues he made a substantial showing in his successive postconviction petition that he was denied the effective assistance of trial counsel based on counsel's failure to investigate or call Barrier as a witness for the defense. Defendant attempts to bolster this claim by submitting evidence that his trial counsel was suspended from the practice of law and subsequently disbarred several years after this case. Defendant attaches reports to his proposed successive petition evidencing trial counsel's disciplinary proceedings.

¶ 65     The United States Constitution guarantees criminal defendants the right to effective assistance of counsel. Thus, where a criminal defendant is convicted of an offense but did not receive constitutionally adequate representation, he can seek relief to vindicate his constitutional right to counsel. *People v. Burnett*, 385 Ill. App. 3d 610, 614 (2008). To prove that he was denied the effective assistance of counsel guaranteed by the sixth amendment, a petitioner must show (1) that "counsel made errors so serious that [he] was not functioning as the 'counsel' guaranteed [petitioner] by the Sixth Amendment," and (2) "a reasonable probability that, but for

30

counsel's unprofessional errors, the result of the proceeding would have been different."
*Strickland v. Washington*, 466 U.S. 668, 687 (1984). We analyze claims of ineffective assistance of counsel by considering the entire record. *People v. Hommerson*, 399 Ill. App. 3d 405, 415 (2010). A defendant who brings a claim of ineffective assistance must prove both prongs: (1) that the attorney's performance was deficient and (2) that he was prejudiced as a result of the deficient performance. If a defendant is not prejudiced by the allegedly deficient performance of his attorney we should address that issue first. *People v. Hale*, 2013 IL 113140, ¶ 17 (courts may "proceed*** directly to the prejudice prong without addressing counsel's performance."). "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id*. at 691 (citing *United States v. Morrison*, 449 U.S. 361, 364–65 (1981)).

¶ 66      Barrier's statements could not change the outcome on retrial nor do they undermine our confidence in the outcome of the proceedings. As we previously discussed, the State charged defendant with felony murder and the jury returned a general verdict of guilty, meaning the jury found defendant guilty of felony murder. Accepting Barrier's statements as true, they do not exculpate defendant from his participation in the robbery that led to the victim's death nor do they mitigate his participation. Defendant has not demonstrated prejudice from trial counsel's failure to elicit these statements at trial.

¶ 67      Furthermore, "an ineffective-assistance-of-counsel claim which arises from a matter of defense strategy will generally not support a claim of ineffective representation." *Flores*, 128 Ill. 2d at 106. "[T]he decision to call particular witnesses is a matter of trial strategy, and *** defense counsel need not call a witness if he reasonably believes that under the circumstances the individual's testimony is unreliable." *Id*. Barrier's statements are hearsay and would not have

been admissible at defendant's trial if she had been present. See *People v. Bowel*, 111 Ill. 2d 58, 66 (1986). Defendant's trial counsel reasonably could have concluded that Barrier's testimony would not be admitted and had good reason not to call her as a witness. Because we cannot say that trial counsel's decision was unreasonable under the circumstances, "we cannot say that the defendant was denied a fair trial as a consequence of counsel's election not to call [Barrier.]" *Flores*, 128 Ill. 2d at 107. Therefore, defendant has failed to make a *prima facie* showing to establish his ineffective assistance claim and the trial court did not err in denying defendant leave to file his successive petition.

¶ 68     Because of our disposition, there is no need to consider the request this matter be remanded to a different trial judge or any other arguments raised in this appeal. For the foregoing reasons we affirm the judgment of the circuit court.

¶ 69                                         CONCLUSION

¶ 70     The judgment of the circuit court of Cook County is affirmed.

¶ 71     Affirmed.